UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | CASE NO. 1:20-CR-00094-TWP-TAB |
| | ) | |
| JOSEPH KREJSA | ) | -03 |
| | ) | |
| *Defendant.* | ) | |

## SENTENCING MEMORANDUM OF JOSEPH KREJSA

Joseph Krejsa served his community and the Muncie Police Department faithfully for nearly thirty years. He has been a devoted husband and father to his wife and three children who all have suffered immensely as a result of his conviction. This otherwise faithful service and commitment to his community and family does not excuse his conduct. Mr. Krejsa fully accepts responsibility for his conduct but asks the Court to consider his acceptance of responsibility before trial, his decades of public service, the impact confinement would have on his family, and his unique medical condition and need for his family's involvement in management of his congenital heart condition. A significant period of prison confinement within the guidelines range of 21 to 27 months would put his life at great risk, while a sentence below the suggested guidelines range would still reflect the seriousness of his offense, promote respect for the law, and provide for just punishment given the nature and circumstances of his offense and his history and characteristics. Mr. Krejsa therefore respectfully asks for a sentence below his guidelines range.

## I.      BACKGROUND

### A.  Decades of Service to the Muncie Community

Joseph Krejsa's career with the Muncie Police Department began in 1993. Until the incident for which he will be sentenced by the Court, Mr. Krejsa's character and reputation in the Muncie community was surpassed by few. Here are a few examples of his exemplary service:

- In 1994, a year into the job, he entered a burning apartment building, smoke filled and engulfed in flames, and rescued a disabled person, saving the victim's life.
- In 1996, he chased down a serial rapist.
- In 2005, he talked down a suicidal man with a long gun.
- In 2008, Mr. Krejsa received the Uniformed Officer of the Year award.

Throughout his lengthy career of public service, he received commendations from other government entities for his service to his community and had a reputation for hard work, reliability, honesty, mentorship, and faithful service to the community in Muncie. He was never once cited for improper use of force or otherwise failing in his duties as an officer.

Mr. Krejsa was promoted to Sergeant in July 2002 after 13 years in patrol. In this role, Mr. Krejsa was known within the department for his mentorship, leadership, and commitment to his work. Countless officers attest to Mr. Krejsa's devotion to training, counseling, and supporting younger officers in police tactics and their personal lives. As the current Muncie Chief of Police Nathan Sloan wrote to the Court: **Mr. Krejsa's personnel file recognizes him for his "exceptional public service, apprehending dangerous criminals, and risking his own life for those he likely didn't know."** *See* Letters Submitted to the Court, N. Sloan at 19.

Mr. Krejsa was known as a supervisor who followed the rules and was never dishonest. *Id.* K. Duncan at 38. Mr. Krejsa did not hesitate to authorize the arrest of a fellow officer's child and participated in the arrest of Chase Winkle, the son of the then-former (and later) department chief. *Id.* R. Plummer at 21-22. Mr. Krejsa was also known to help those in need in a sympathetic and understanding manner, including a rape victim who wrote the Court that Mr. Krejsa changed her perception of officers as friends and not foes. *Id.* T. Seals at 15. Mr. Krejsa's former colleagues

recognize that he has pled guilty to accept responsibility for his actions and will accept his sentence, but they are all asking the Court for leniency. *Id.* J. Lenox at 20.

**B. Joseph Krejsa's Commitment to His Family**

Mr. Krejsa is a devoted husband and father, committed to providing for and raising his three children. Mr. Krejsa has been married to his wife Beth since 1998 and remains the primary provider for his family. Together, they have three children: Chloe; Anna; Wyatt. All three have written the Court letters describing in vivid detail the relationships he has spent years nurturing. His oldest daughter Chloe will be married by the time of sentencing; his second daughter Anna is in college; and his youngest Wyatt will be entering his senior year in high school after finishing in second place in the State wrestling tournament. *Id.* J. Werner at 55. His pastor recognizes him as a "great man of faith, a great husband, and an amazing father, as well as a friend to many." *Id.* C. Mock at 16. His family has already suffered the public humiliation, alienation, and isolation that resulted from the charges against Mr. Krejsa and his conviction, including his resignation from the department and his family's move from Muncie, where they lived for decades.

In addition to the challenges imposed on his family as a result of the charges and his acceptance of his responsibility for the conduct underlying his conviction, his family has been dealt a series of personal tragedies. His mother passed away a month after his indictment and he manages as power of attorney the medical care and other matters for his father, who is battling cancer and dementia. Then last summer, Mr. Krejsa's nephew, Officer Noah Shahnavaz, was killed in the line of duty while serving the Elwood Police Department.

Mr. Krejsa will never return to law enforcement even if that was a possibility. Instead, he hopes to eventually find employment in the public sector again one-day as an EMT or other emergency personnel once this period is behind him.

### C. Joseph Krejsa's Medical Condition

Mr. Krejsa underwent open-heart surgery on July 8, 2022, followed by a months-long recovery period when he was medicated and unable to work or travel. This procedure stemmed from a preexisting medical condition which has placed him under the continual care of physicians for a congenital heart issue since his first surgery in June 1999. His family has been critical to his recovery from the surgery, including catching him in the middle of the night and rushing him to the hospital for treatment. *Id.* A. Krejsa at 3-4. His family remains key to his care both in managing his medications but also in identifying and addressing episodes where his heart will race high and then plunge dangerously low within the span of 30 minutes. *Id.* B. Krejsa at 6-11.

According to one of his physicians, Dr. Joel Corvera of Indiana University Health, although Mr. Krejsa is doing well from a heart health perspective, his typical management plan for a patient like Mr. Krejsa requires periodic CT scans and echocardiograms. *Id.* J. Corvera at 13-14. The heart valves that were replaced in the surgery last summer degenerate and require frequent surveillance to identify when additional interventions are required on an annual or biannual basis. Given the complexity of Mr. Krejsa's condition, and his history, continuing the routine, thorough, and specialized medical care by those who know him best, including Dr. Corvera, is critical to continuing his health. Also vital to maintaining his health is the engaged, knowledgeable, and capable assistance of his family. Put simply, Dr. Corvera is concerned that confinement would deny him that familial support and other ongoing medical care in detriment to his health.

## II.      THE OFFENSE CONDUCT

When Mr. Krejsa arrived at the scene of an arrest on August 9, 2018, other officers under his supervision had the arrestee handcuffed and on the ground. The arrestee's face was visibly injured. MPD officers took the arrestee to the hospital at Mr. Krejsa's direction.

The next day, Mr. Krejsa reviewed the incident and wrote on the reports of Officers Joseph Chase Winkle and Jeremy Gibson that he had watched the videos and that the officers' uses of force were appropriate. Mr. Krejsa now recognizes and admits that knew at that time that those uses of force did not comply with department policies. A few days later, a captain asked Mr. Krejsa to conduct a more in-depth review of the officers' uses of force during that arrest. In response, Mr. Krejsa watched body worn camera videos and wrote a report that misstated aspects of the incident and misleadingly suggested that officers initially used minimal levels of force and escalated to deadly force only after exhausting all lower levels.

Specifically, Mr. Krejsa falsely (1) implied that the force used against the arrestee was justified to ensure officer safety and to effectuate the arrestee's arrest when he knew that the force was not within policy; (2) asserted that officers used only low levels of force near the start of the incident when he knew that Winkle had used a high level of force, including deadly force, near the start; (3) asserted that the officers escalated to higher levels of force only after lower levels of force were ineffective when he knew that Winkle had used a high level of force, including deadly force, before using lower levels of force; (4) stated that Winkle "kneeled" on the arrestee's shoulder and upper body when he knew that Winkle had used his knee to strike the arrestee's head and neck area; and (5) implied that Winkle's uses of force against the arrestee caused only cuts to the arrestee's face when he knew that Winkle's uses of force caused serious bodily injury. Mr. Krejsa had been trained to never knowingly include false statements in, or omit material information from, reports, and he knew that the type and level of force used, the location on an arrestee's body where an officer makes contact during a use-of-force incident, the arrestee's level of resistance or compliance, and injuries sustained by an arrestee as a result of an officer's use of force were material facts that were required to be included in the report. Mr. Krejsa recognizes and

acknowledges that the inaccuracies and omissions in his report and documents were intended to influence a possible investigation into the incident and were within the Federal Bureau of Investigation's jurisdiction.

Yet Mr. Krejsa's conduct, although wrong and the basis of his felony conviction, does not show a concerted effort to cover-up of the admitted lying and unlawful use of force by his subordinates. Mr. Krejsa's review took place at his desk in his small basement office where he had limited access to portions of videos showing some aspects of the use of force through a single 19-inch computer monitor. Mr. Krejsa was also unquestionably lied to by his subordinate, as reflected in his co-defendant's guilty plea. Mr. Krejsa now recognizes he should have immediately acted to correct those false statements, but there is no evidence suggesting Mr. Krejsa failed to do so for a personal or professional benefit. Ultimately, when faced with a third incident of wrongful use of force by his subordinates, and further false reports, Mr. Krejsa reported the incident to his superiors as documented in email to his superiors on February 18, 2019.

### III.    A SUFFICIENT AND FAIR SENTENCE

It has long been "the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Consistent with this tradition of individualized justice, this Court should look beyond the applicable guidelines range and carefully consider each of the individualized sentencing considerations set forth in Section 3553(a) to fashion a sentence in which the punishment imposed "fit the offender and not merely the crime." *Pepper v. United* States, 131 S. Ct. 1229, 1240 (2011) (citations omitted). The Court should ensure that it imposes a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C.

§ 3553(a). This directive—that a sentence should be what is *minimally necessary* in each individual case—necessitates an understanding of Mr. Krejsa as well as his conduct. Given these principles, Mr. Krejsa offers the following insight into himself and his actions under the sentencing factors, which he respectfully submits necessitates a sentence below his recommended guideline range.

### A.  The Nature and Circumstances of Mr. Krejsa's Offense

The Court is aware of the facts and circumstances surrounding Mr. Krejsa's offense. On August 9, 2018, Mr. Krejsa arrived at the conclusion of a violent arrest. At Mr. Krejsa's direction, his subordinate officers took the arrest to the hospital given the injuries to the arrestee's face. He then reviewed both the reports of two subordinates, defendants in this case, one of whom has pled guilty to making false statements in that and other reports, Dkt. 194 p. 11, and videos from the incident and deemed the uses of force appropriate. He knew though the reports were false and the uses of force did not comply with policy. Yet Mr. Krejsa did not do so in exchange for any benefit or under any form of compulsion. Then, a few days later, he wrote a report that misstated aspects of the incident. But again, he did not do so for any personal or professional benefit or as part of any agreement or understanding to cover-up his subordinate officers' wrongful actions or at the direction of his superiors. These two actions form the basis of his admission that he knowingly falsified the reports and did so with an intent to influence a possible investigation into the incident.

Mr. Krejsa deeply and sincerely regrets his actions and wishes he had conducted himself differently. He knows that had he acted different, the wrongful conduct of his subordinates could have, and should have, been stopped sooner. He also knows that he was not the only officer that understood and knew that wrongful and illegal conduct was taking place within the Muncie Police Department. He happened to be the one officer though that signed his name to reports that were in fact false. He now knows that he will bear severe responsibility for failing to identify and stop his

subordinates wrongful conduct in August 2018 and not forcing his leadership chain to otherwise take steps to intervene. Critically, Mr. Krejsa did do just this about six months later in February 2019 when he did report the wrongful use of force by his subordinates and their additional false reports by personally writing an email to his superiors on February 18, 2019. He just wishes he had done so much sooner and accepts that he will now be punished for his actions.

## B. The Remarkable History and Characteristics of Joseph Krejsa

Mr. Krejsa's near thirty years with the Muncie Police Department left him a reputation as a faithful and committed officer dedicated to protecting his community. When faced with danger, Mr. Krejsa ran toward danger to protect those in need. When faced with evil or peril, he confronted it. He was recognized for his dedication and devotion and was never once cited for improper use of force or otherwise failing in his duties as an officer of the Muncie Police Department.

Mr. Krejsa's nearly two decades in leadership—as a sergeant one step up in the department's ranks—gave him the opportunity to mentor, train, and counsel dozens of other officers. He is universally recognized by these officers as devoted to training, counseling, and supporting younger officers in both police tactics but also and in their personal lives. Before the charges and his conviction in this case, Mr. Krejsa was known to follow the rules and never be dishonest. His conviction has irrevocably put a dent in that reputation, but he will also be known as a dedicated officer who put others first, worked hard, mentored others, and did not bow to department politics with his unhesitating decisions to authorize the arrest of a fellow officer's child and participation in the arrest of Mr. Winkle.

Mr. Krejsa's commitment to his family is equally commendable. All three of his children have written in support of their father. He is the pillar of their household who built integrity into everything his children did while showing them how to live selflessly in their community. He

modeled courage and determination for his daughters and morality and sacrifice to his son. His wife Beth has written of the devastation Mr. Krejsa's confinement will have on their family, the critical role he plays for his father, and the challenges presented by his medical condition. From the start of their family, he has been there for his wife and children—often sacrificing his sleep to attend his children's events as he worked evening shifts—with unhesitating devotion.

The Court's assessment should account for his commitment to his community and family, which shows a life lived according to principles the Court should recognize as commendable.

**C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

Section 3553(a)(2)(A) provides that the sentence imposed should provide a "just punishment for the offense" of conviction that reflects the offense's seriousness and to promote respect for the law. The Court needs to ask what punishment is called for by all the conduct at issue in the case and **_the entirety of the person_** to be sentenced, looking to the guidelines only as an advisory suggestion and not a bounded range. Here, a below-guidelines sentence is appropriate.

The conduct for which Mr. Krejsa has been convicted is indeed serious. Had he accurately reported the illegal conduct and the false statements of his subordinates, the illegal conduct of his subordinates might have been stopped sooner. Yet that is exactly what Mr. Krejsa did about six months later in identifying to leadership the wrongful actions of his subordinates. Furthermore, Mr. Krejsa voluntarily sat down with the government and provided them information in furtherance of their investigation. This is all conduct the Court should consider in issue Mr. Krejsa's sentence—one that recognizes the ways in which Mr. Krejsa's conduct was different.

**D. Mr. Krejsa Has Learned His Lesson – His Story Is Already a Cautionary Tale**

Section 3553(a) requires the Court to impose a sentence that will provide adequate deterrence to criminal conduct and protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a)(2)(B) & (C). Specific deterrence and the need to protect the public simply are not issues in this case. One cannot reasonably claim that the Court needs to impose a sentence of significant imprisonment to deter Mr. Krejsa from future criminal conduct. The experience of the last three and a half years has been a sufficient deterrent alone. It bears repeating what Mr. Krejsa has already lost because of his actions: his nearly thirty-year career and reputation for honesty and integrity in the Muncie community; the ability to protect his community as a law enforcement officer; and his physical and mental health. His self-inflicted harm has been so severe that Mr. Krejsa and his family thought the only way for them to recover was to start anew somewhere where Mr. Krejsa's misconduct would not precede their every move. Leaving a near-lifetime of community of friends was an especially difficult penalty to pay, but one that could not be avoided.

There is also no need for the Court to impose some severe penalty as a cautionary tale. For the reasons outlined above, Mr. Krejsa has suffered severely because of his conduct. Furthermore, there is no need for the Court to consider whether he needs additional educational or vocational training. Since leaving the department, he has been more than ably employed and expects to be welcomed back by his employer as a productive member of society as soon as the Court allows.

Finally, there is no need to incarcerate Mr. Krejsa to protect the public from some unforeseen future bad acts as he will never wear the badge again and has learned from his mistakes. His conduct on pretrial release has been exemplary. In fact, the entire conduct of his life and career—other than the actions for which the Court will sentence him—have been commendable. There is simply no basis to use sentencing to isolate Mr. Krejsa from society.

### E. Mr. Krejsa's Medical Condition Justifies Special Consideration

Mr. Krejsa's medical condition deserves careful consideration by the Court. His physician Dr. Corvera has informed the Court that he is concerned that prison would deny him the support

he needs from his family in managing his care and other ongoing medical care. Mr. Krejsa is going to be 53 in a few weeks having recovered from two open-heart surgeries. Despite excellent medical care, his condition remains complex and requires specialized care by the physicians who know his history and understand how his family can support him.

Removing Mr. Krejsa from that support system—both Dr. Corvera and the rest of the medical team and his family—risks undermining the progress he has made in the last 11 months since his surgery in July 2022. A sentence of years in prison risks irrevocably stymying his recovery and putting his ability to work and live after his period of confinement in jeopardy.

## F. The need to avoid unwarranted sentencing disparities

Section 3553(a)(6) directs that in imposing sentence, the Court should fashion a judgment that "avoid(s) unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For all the reasons noted above, this case and this defendant are markedly different from most "other" false statement prosecutions.

Furthermore, a below-guidelines sentence would not create any disparity among other defendants with similar records who have been found guilty of similar conduct. In the most comparable case identified by counsel, *United States v. Vazquez*, 3:12-cr-00738-PG (P.R.D. Apr. 17, 2015), the Court sentenced a former police officer to twelve months and a day for making false statements to the FBI in its investigation into a fatal beating of an arrestee. In other cases, such as *United States v. Dugue*, 2:10-204-NJB-JVM (E.D. La. Nov. 4, 2016), the court sentenced the defendant to one year of probation under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure after pleading guilty to accessory after the fact to deprivation of rights under color of law where he falsely arrested an individual, prepared a false report, fabricated evidence, and failed to disclose exculpatory evidence. Although the offense to which Mr. Krejsa pled guilty carries a

higher maximum statutory penalty, the factual basis supporting his offense is limited to a false report. In fact, in cases involving submission of false documents, court regularly impose sentences of probation. *See United States v. Vaughn*, 6:16-cr-10021-EFM (D. Kan. Nov. 17, 2016) (ordering two years' probation for officer's filing of false documents to get paid for work he did not do); *United States v. Stanfield, et al.*, 3:19-cr-195-RGJ (W.D. Ky. Feb. 12, 2020) (ordering three years' probation for wire fraud related to overtime requests).

## IV.    MR. KREJSA'S SENTENCING REQUEST

### A. A Below Guidelines Sentence is Appropriate Under these Unique Circumstances

As noted above, the Supreme Court has instructed that district courts should use their ample discretion to fashion a sentence that is fitting for the individualized circumstances of each case. This Court thus has unfettered discretion as to what weight to place on any one of the Section 3553 factors to fashion at a sentence that is, in the end, "sufficient, but not greater than necessary to serve the purposes of sentencing" under the unprecedented circumstances of our time. Finally, and perhaps most importantly, the Supreme Court has rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall v. United States*, 552 U.S. 38, 47 (2007). Applying these principles, courts have rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.*; *see also United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006) ("The statute does not weight the factors. That is left to the sentencing judge, within the bounds of reason, which are wide.").

But for his unique medical condition, Mr. Krejsa would not have asked the Court to impose a sentence below the guidelines. He recognizes the seriousness of his offense and understands that the Court will impose just punishment. His medical condition, however, is a crucial factor here.

Given his medical condition, and the risks prison would impose on him, Mr. Krejsa respectfully submits that the Court should think differently regarding the type of sentence that is appropriate.

Under 18 U.S.C. § 3561(c)(1), the Court can sentence Mr. Krejsa to a period of probation of one to five years. The Court can impose restrictions upon Mr. Krejsa as conditions of that probation, including, for example, that Mr. Krejsa be confined to his home during that entire extended term of probation. Although such extended terms of home incarceration are unusual, Mr. Krejsa's medical condition, and need for his family's support in his treatment, is unusual. And, although home confinement is, admittedly, not incarceration, a sentence of probation is hardly a "free pass."[1]

> [P]robation is also a punitive measure, and "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.

*United States v. Brady*, 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (quoting U.S. Sentencing Guidelines Manual ch. 5, pt. B, Intro. Cmt.); *see also Gall*, 552 U.S. at 48, n.4 ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society.... Often these conditions comprehensively regulate significant facets of their day-to-day lives.") (quoting 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999)). As the COVID-19 period taught us all, home incarceration is, in fact, a significant restriction on one's liberty. It is therefore not surprising that even before the pandemic, courts ordered probation in a wide variety of cases, regardless of the applicable advisory guideline ranges.[2]

---

[1]    As the Supreme Court has explained: "[C]ustodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *See Gall*, 552 U.S. at 47-48.

[2]    *See, e.g., Gall*, 552 U.S. at 60 (upholding probation despite a 30-37 month guideline range); *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*) (affirming probation with home detention, community service, and a fine for tax evasion); *United States v. Bueno*, 549 F.3d 1176, 1181 (8th Cir. 2008) (imposing sentence of probation where government requested 108-135 months incarceration while invoking *Gall* for noting that offenders "on probation are nonetheless subject to several standard conditions that substantially restrict their liberty"); *United States v. Hawkins*, 2007 WL 1241538 (2d Cir. 2007) (imposing probation for healthcare fraud despite guidelines range of

Rather than impose a sentence with a significant period of incarceration, Mr. Krejsa respectfully submits the Court should sentence him to probation with home confinement for whatever term the Court believes appropriate. *See* 18 U.S.C. § 3561(c)(1). In imposing that sentence, the Court can add all appropriate additional conditions, including, for example, community services requirements.

## B.   A Guideline Sentence Is Excessive

As noted above, Mr. Krejsa candidly admits that absent his medical condition, he would not ask the Court to impose a sentence of probation for his offense. Yet, while a term of imprisonment within the Guidelines range may be appropriate but for his medical condition circumstances, the imposition of a guideline sentence would be excessive given the facts and circumstances Mr. Krejsa's medical condition.

In his plea agreement, Mr. Krejsa and the government agreed to guideline calculations that result in an offense level of sixteen. The probation officer has adopted those calculations as correct in his presentence investigation report. *See* PSR, ¶¶ 19-31. Based on those calculations, with no criminal history, Mr. Krejsa would qualify for an advisory sentencing range of 21 to 27 months' imprisonment. The government also agreed to recommend a sentence at the low end of the guidelines range, provided the defendant continues to fully accept responsibility for the offense, does not commit a new criminal offense before the date of any sentencing, and does not otherwise violate the terms of any pre-trial release before the date of sentencing. Mr. Krejsa has done just that and asks the Court to take a step further, recognize his unique medical condition, and sentence

---

12-18 months); *United States v. Desmond*, 2008 WL 686779 (N.D. Ill. March 11, 2008) (probation for perjury and wire and mail fraud despite advisory guideline sentence of 60 months); *United States v. Yambor*, 2010 WL 3910327 (E.D. Wis. Oct. 2, 2010) (imposing probation with home confinement for a $200,000 fraud committed over four years); *United States v. Collado*, 2008 WL 2329275 (S.D.N.Y. June 5, 2008) (imposing three years' supervised release with certain conditions, 200 hours of community service and a $100 assessment."); *United States v. Coughlin*, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008) (probation with home detention despite guidelines range of 27-33 months).

him below this Guidelines range as allowed for by his plea agreement's terms that allow him to recommend any sentence authorized by statute. Applying a guideline sentence that does not account for this conduct and his circumstances would improperly elevate the guidelines over application of Section 3553(a)'s factors in contravention of U.S. Supreme Court precedent.

## CONCLUSION

Joseph Krejsa recognizes that his own conduct brought him to this moment in his life. Following his indictment and leading up to the Court's then-scheduled trial date, Mr. Krejsa consistently worried what this day—sentencing—would mean for his family. He knows that his actions have already harmed his family and those who trusted him in ways that he never contemplated. He further understands the future collateral harm they will endure because of his actions. Mr. Krejsa knows that this long and arduous journey is not over, but in pleading guilty, he was hoping that he could find a way to the other side of now and that he could find a way to support his family—and serve his community—once again.

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Daniel E. Pulliam*
Erica H. MacDonald (MN #0387609)
90 South 7th Street, Suite 2200
Minneapolis, Minnesota 55402
Phone: (612) 766-7000
Fax: (612) 766-1600
Email: erica.macdonald@faegredrinker.com

Daniel E. Pulliam (IN #29439-49)
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
Phone: (317) 237-1171
Fax: (317) 237-1000
Email: daniel.pulliam@faegredrinker.com

*Attorneys for Defendant Joseph Krejsa*

15

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

All counsel of record

By: */s/ Daniel E. Pulliam*
Daniel E. Pulliam, #29439-49